## IN THE DISTRICT COURT OF SEQUOYAH COUNTY
## STATE OF OKLAHOMA

THE CHEROKEE NATION,

      Plaintiff,

vs.

MORRIS & DICKSON CO., LLC,

      Defendant.

Case No. CJ-23-80
JURY TRIAL DEMANDED

SEQUOYAH COUNTY, OKLAHOMA
FILED
IN DISTRICT COURT

JUN 0 8 2023

GINA L. COX, COURT CLERK
BY_____DEPUTY

**PETITION**

EXHIBIT
2

TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     PARTIES ..............................................................................................................5

        A.      Plaintiff ....................................................................................................5

        B.      Defendant .................................................................................................6

III.    JURISDICTION AND VENUE ...........................................................................6

IV.     FACTUAL BACKGROUND ...............................................................................8

        A.      Defendant contributed to the creation of a devastating opioid crisis in
                Cherokee Nation. ....................................................................................8

        B.      Defendant had a duty to identify, report, and halt suspicious orders, and to
                prevent diversion at the point of sale. ...................................................14

                1.      The common law. ........................................................................14

                2.      Defendant's own conduct. ...........................................................15

                3.      Federal anti-drug diversion statutes and regulations. ................16

                4.      Duties under Oklahoma controlled substances law. ...................22

        C.      Defendant deliberately disregarded its duties. ......................................25

                1.      The distribution numbers alone establish gross negligence. ......25

                2.      Defendant continued to violate its duties. ..................................31

        D.      Defendant has injured and continues to injure Cherokee Nation. .........34

        E.      Defendant's concealment and conspiracy. .............................................36

V.      CLAIMS FOR RELIEF .....................................................................................38

        COUNT I: NEGLIGENCE/GROSS NEGLIGENCE ........................................38

        COUNT II: UNJUST ENRICHMENT ...............................................................40

        PRAYER FOR RELIEF .....................................................................................41

i

## I.     INTRODUCTION

1.      Plaintiff, the Cherokee Nation ("Plaintiff" or "Cherokee Nation"), brings this Petition for compensatory, punitive, other damages, restitution, and abatement.

2.      Prescription opioids are powerful pain-reducing medications. When used properly, they can help manage pain for certain patients. But, even then, these drugs can cause addiction, overdose, and death. When used to treat chronic pain, or when used for non-medical purposes, those risks are amplified.

3.      In recent years, opioid use for both chronic pain and non-medical purposes has grown dramatically, resulting in an epidemic of abuse. Nationwide, millions of Americans are addicted to prescription opioids, and tens of thousands die annually from opioid overdoses.

4.      According to the Centers for Disease Control and Prevention ("CDC"), in Oklahoma, where Cherokee Nation is located, 5,213 people died of drug overdoses between 2014 and 2020, and the "main driver" of these deaths was prescription and illicit opioids.[1] Data from the Substance Abuse and Mental Health Services Administration indicates that over 194,000 residents use prescription opioids for non-medical purposes in Oklahoma alone.[2]

5.      Oklahoma, where the majority of Cherokee Nation's citizens reside, has led the country in opioid abuse. Oklahoma has ranked number one nationally for the non-medical use of

---

[1] CDC, *Drug Overdose Death Data*, https://www.cdc.gov/drugoverdose/deaths/index.html (last updated June 2, 2022) (777 deaths in 2014; 725 deaths in 2015; 813 deaths in 2016; 775 deaths in 2017; 716 deaths in 2018; 645 deaths in 2019; 762 deaths in 2020).
[2] Substance Abuse and Mental Health Servs. Admin., *National Survey on Drug Use and Health: Comparison of 2002–2003 and 2013–2014 Population Percentages (50 States and the District of Columbia)* 16–17 (2015),
http://www.samhsa.gov/data/sites/default/files/NSDUHsaeLongTermCHG2014/NSDUHsaeLongTermCHG2014.pdf.

prescription opioids for adults.[3] In recent years, more overdose deaths in Oklahoma involved hydrocodone or oxycodone than alcohol, cocaine, methamphetamine, heroin, and all other illegal drugs combined.[4]

6.     Deaths of Cherokee Nation citizens contribute to these statewide statistics. The U.S. Surgeon General has visited the tribal representatives in Oklahoma and declared that the "prescription opioid epidemic that is sweeping across the U.S. has hit Indian country particularly hard." Cherokee Nation has suffered injury different in kind from the general public.

7.     The opioid epidemic in Cherokee Nation could have been, and should have been, prevented by Defendant company acting within the U.S. drug distribution industry. This drug wholesaler and distributor has profited greatly by causing Cherokee Nation to become flooded with prescription opioids.

8.     Studies suggest that a substantial number of the opioid prescriptions issued in Oklahoma each year are diverted to non-medical uses. These conclusions about opioid diversion are further supported by Drug Enforcement Administration ("DEA") data showing that in recent years Oklahoma, where Cherokee Nation is located, has seen annual distribution exceeding 660 milligrams per citizen, and 5,923 milligrams per opioid user.[5]

---

[3] Rachel N. Lipari et al., Substance Abuse and Mental Health Servs. Admin., *State and Substate Estimates of Nonmedical Use of Prescription Pain Relievers* (2017), https://www.samhsa.gov/data/sites/default/files/report_3187/ShortReport-3187.html.
[4] *See* CDC, Wide-Ranging Online Data for Epidemiologic Research (WONDER), http://wonder.cdc.gov.
[5] Drug Enf't Admin., ARCOS 3 - Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*,
https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2013/2013_rpt1.pdf;
https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2014/2014_rpt1.pdf;
https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2015/2015_rpt1.pdf;
https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/report_yr_2016.pdf.

9.      As detailed below, Defendant has legal obligations to combat diversion, which they have routinely and continuously failed to do. They have taken advantage of the massively increased demand for prescription opioids for non-medical uses (which demand was itself created by Defendant's conduct) by profiting heavily from the sale of opioids that they knew, or should have known, were being diverted from the legitimate supply chain to illegitimate channels of distribution and use. The failure of Defendant to comply with its legal obligations to prevent diversion and to alert authorities to potential diversion continues today, despite the well-known harm resulting from the opioid crisis. As a result of these shortcomings, unauthorized opioid users in and around Cherokee Nation have ready access to opioids from Defendant's supply line.

10.     The misconduct of Defendant, including their consistent failure to comply with their legal obligations and their concealment thereof, has led to an epidemic of prescription opioid abuse. American Indians, including Cherokee Nation, have been significantly impacted by this epidemic. American Indians suffer the highest per capita rate of opioid overdoses.[6]

11.     Hundreds of American Indians have died of opioid overdoses in recent years. And the number of lethal overdoses hardly captures the impact of Defendant's conduct on Cherokee Nation citizens. For every opioid overdose death, it is estimated that there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 non-medical users of opioids.[7]

---

[6] National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief.pdf.

[7] Jennifer DuPuis, *The Opioid Crisis in Indian Country*, at 37, https://www.nihb.org/docs/06162016/Opioid%20Crisis%20Part%20in%20Indian%20Country.pdf (last visited Feb. 23, 2023); Gery P. Guy, Jr. et al., *Emergency Department Visits Involving Opioid Overdoses, U.S., 2010-2014*, 54 AM. J. OF PREVENTIVE MEDICINE (Jan. 2018), http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext.

12.     Studies have reported that American Indian teens abuse prescription opioids at rates 60% higher than white youths. [8] The opioid epidemic has also injured even the youngest members of Indian society. In 1992, in the United States, only 2% of pregnant women admitted for drug treatment services abused opioids. By 2012, opioids accounted for 38% of all drug treatment admissions of pregnant women.[9] Many tribal women have become addicted to prescription opioids and have used these drugs during their pregnancies. As a result, many tribal infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome, which can have adverse short- and long-term developmental consequences.[10]

13.     Defendant's prescription opioid diversion on and around Cherokee Nation contributes to a range of social problems, including child abuse and neglect, and family dysfunction. Cherokee children are regularly removed from their families as a result of prescription opioid dependency and abuse by both children and parents—all of which directly or indirectly affect substantially all citizens of Cherokee Nation. These removals harm children and families, and they harm Cherokee Nation itself, particularly when children are placed with families outside Cherokee Nation. Other social problems caused by the opioid epidemic include criminal behavior, poverty, property damage, public blight, unemployment, loss of productivity, and social despair.

14.     Damages suffered by Cherokee Nation include the costs of (a) medical care, therapeutic and prescription drugs, and other treatments for patients suffering from opioid-related

---

[8] Linda R. Stanley, *Rates of Substance Use of American Indian Students in 8th, 10th, and 12th Grades Living on or Near Reservations: Update, 2009–2012*, PUB. HEALTH REP. (Mar.–Apr. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3904895/table/T1/.
[9] Naana Afua Jumah, *Rural, Pregnant, and Opioid Dependent: A Systematic Review*, 10 SUBSTANCE ABUSE 35 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/.
[10] Jean Y. Ko et al., *CDC Grand Rounds: Public Health Strategies to Prevent Neonatal Abstinence Syndrome*, 66 MORBIDITY AND MORTALITY WEEKLY REPORT 242 (Mar. 10, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf.

addiction, overdoses, or disease; (b) law enforcement by Cherokee Nation's own law enforcement agencies and public safety measures necessitated by the ongoing opioid crisis; (c) opioid-related counseling and rehabilitation services; (d) welfare for children whose parents suffer from opioid-related disease or incapacitation; (e) increased crime, property damage, and public blight caused by opioids.

15.     These costs were incurred not by reason of an accident or emergency situation necessitating the normal provision of police, fire, and emergency services, but rather to address public harm caused by a persistent course of deceptive and unlawful conduct by Defendants.

16.     Cherokee Nation seeks: (a) injunctive relief; (b) compensatory damages; (c) punitive damages; (d) restitution; (e) disgorgement of all amounts unjustly obtained by Defendant; (f) abatement; (g) attorneys' fees and costs; and (h) such further relief as justice may require.

## II.     PARTIES

### A.     Plaintiff

17.     Cherokee Nation is a sovereign Indian nation that occupies all or part of 14 Counties in Northeast Oklahoma, which are Adair, Cherokee, Craig, Delaware, Mayes, McIntosh, Muskogee, Nowata, Ottawa, Rogers, Sequoyah, Tulsa, Wagoner, and Washington ("the 14 Counties"). Cherokee Nation's jurisdiction is recognized by state, federal, and tribal law. Cherokee Nation is not a citizen of any state for purposes of diversity jurisdiction. Cherokee Nation has approximately 400,000 citizens, the majority of which live in and around Cherokee Nation.[11] Cherokee Nation citizens comprise a significant percentage of the population in these counties.

18.     The Attorney General of Cherokee Nation brings this action in the exercise of her powers on behalf of the Cherokee Nation, in its proprietary capacity and under its *parens patriae*

---

[11] The Cherokee Reservation is called the "Cherokee Nation Jurisdictional Area."

5

authority, in the public interest to protect the health, safety, and welfare of the citizens of Cherokee Nation. Cherokee Nation is not asserting claims that belong to individual Cherokee citizens, nor seeking to recover on behalf of individual citizens based on those individuals' personal injuries or wrongful deaths. Instead, Cherokee Nation is seeking damages for harm to Cherokee Nation as a tribal sovereign, including recovery of the funds Cherokee Nation had to spend on opioid-related care that would otherwise have been available to provide services to its citizens.

### B.   Defendant

19.   Defendant Morris & Dickson Co., LLC ("Morris & Dickson") has distributed, supplied, sold, and placed into the stream of commerce the prescription opioids in and around Cherokee Nation. Defendant was engaged in "wholesale distribution," as defined under state and federal law. Defendant's unlawful conduct in the distribution of prescription opioids is a substantial cause for the opioid crisis in Cherokee Nation.

20.   Defendant is a wholesale distributor of prescription opioids. Defendant is authorized to conduct business in Oklahoma and in Cherokee Nation. Defendant is a Louisiana business entity with its principal place of business in Louisiana.

21.   All of the actions described in this Petition are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendant's officers, Defendant's affairs within the course and scope of their duties and employment, and/or with Defendant's actual, apparent, and/or ostensible authority.

### III.   JURISDICTION AND VENUE

22.   This court has jurisdiction over Defendant because it conducts business in or around Sequoyah County and throughout Oklahoma, and has deliberately engaged in significant acts and omissions within Oklahoma that have injured the Cherokee Nation and its citizens. Defendant

purposefully directed its activities at the Cherokee Nation and its citizens, and the claims arise out of those activities.

23.     Defendant's conduct has caused and is causing damages to the Cherokee Nation's proprietary and sovereign interests, including in Sequoyah County, by imposing significant costs on the Cherokee Nation's health system, undermining the economic productivity of its citizens, and harming the long-term health and welfare of Cherokee Nation citizens.

24.     The Cherokee Nation's presence in Sequoyah County is substantial. In 2016, there were over 14,000 Cherokee Nation citizens living in Sequoyah County. During that same year, the Cherokee Nation Health Center in Sequoyah County served over 100,000 patient visits for medical care, served over 8,000 patients for dental care and over 2,500 patients for eye care. Also in 2016, the Cherokee Nation provided career assistance to over 400 residents living in the county and supported 1,200 jobs. The Cherokee Nation also served over 11,000 people with food assistance and over 400 families with low-income heating and energy assistance in 2016 alone in Sequoyah County. The Cherokee Nation also provided over $4,000,000 to Sequoyah County schools in 2016. In 2016, the Cherokee Nation Casino and Hotel opened in Sequoyah County. The Cherokee Nation operations in Sequoyah County supported nearly $50 million in local income and $152 million in county production of goods and services in 2016 alone.

25.     Defendant's conduct has caused a health crisis in the Cherokee Nation that threatens the health, welfare, economic security, and political integrity of the Cherokee Nation. The financial impact on the Cherokee Nation has been enormous.

26.     The negative impacts on the next generation of Cherokee Nation citizens caused by Defendant's conduct—in particular, the ruinous effects on the health of Cherokee Nation children,

and the removal of Cherokee Nation children from their parents—threatens the continuation of Cherokee Nation.

27.     Venue is proper in this district because a substantial part of the events giving rise to the claim occurred in Sequoyah County. No mandatory venue provision is applicable to this case which would make venue exclusively lie in any other county.

IV.     **FACTUAL BACKGROUND**

    A.     **Defendant contributed to the creation of a devastating opioid crisis in Cherokee Nation.**

28.     "Opioids" are a class of drugs that bind with opioid receptors in the brain. They produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression. Opioids include all drugs derived in whole or in part from the opium poppy—natural, synthetic, and semi-synthetic opioids. Prescription opioids and heroin may be naturally derived from the opium poppy (morphine and codeine), synthesized from an alkaloid (morphine, codeine or thebaine) derived from the opium poppy (semi-synthetics such as oxycodone, hydrocodone and hydromorphone), or totally synthesized without the use of a natural product (such as methadone or fentanyl) while having a similar molecular structure to that of a natural or semi-synthetic opioid. As previously stated, the opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine.

29.     Prescription opioids are powerful, highly addictive painkillers that include oxycodone, hydrocodone, morphine, and codeine. Patients may develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient may require progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the "high." However, opioids depress respiration, and at high doses

can and often do cause respiratory depression and arrest. At higher doses, the effects of withdrawal are more severe. Depending on the dose and the length of time the opioids were used, withdrawal symptoms include severe anxiety, nausea, vomiting, GI disturbances, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist even after the completion of withdrawal.

30.     According to the CDC, from 2006 through 2017, Oklahoma ranked between 4th and 8th in the nation in total opioid prescribing rates each year. In 2017, there were 479 opioid prescriptions dispensed every hour across the State.

31.     The 14 Counties of Cherokee Nation were flooded with opioid pills around this time period. According to the DEA's Automation of Reports and Consolidated Orders System ("ARCOS"),[12] between 2010 and 2014, Defendant shipped more than 3.7 million dosage units of prescription opioids into five pharmacies in the 14 Counties.

32.     No segment of the Cherokee Nation's population was spared from the harmful effects of Defendant's reckless oversupply of opioids. From 1994 to 1996, there was only 1 unintentional overdose involving oxycodone in Oklahoma. From 2012 to 2014, there were 484. From 2007 to 2012, two thirds of all children who died from an unintentional poisoning died from a prescription opioid. Since 2011, more people have died from opioids in Oklahoma than from car accidents.

---

[12] ARCOS is an automated drug reporting system which monitors the flow of Schedule II controlled substances, which include prescription opioids, from their point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances acquisition/distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution.

33.   According to recent county-level estimates by the CDC about drug poisoning deaths between 2003 and 2017, it is estimated there were about 3,300 such deaths in the 14 Counties during that time frame.[13] Since Cherokee citizens make up a large percentage of the population in the 14 Counties, they suffered a large percentage of that harm.

34.   For every Cherokee Nation citizen who died from opioids, there are countless others suffering from addiction and other devastating effects of these drugs. For every opioid-related death within Cherokee Nation, there are numerous hospital admissions and emergency room visits related to opioids, as well as instances of dependence and non-medical use of opioids, all of which have adverse consequences on Cherokee Nation.

35.   Nationwide data collected from 2002 to 2017 describing rates of "pain reliever use disorder" among different segments of the population (which reflects use and abuse of prescription opioids) indicates the prescription opioid crisis affects tribal communities about twice as hard as non-tribal populations.

36.   Cherokee Nation has taken proactive measures in its own healthcare system to fight against prescription opioid abuse. It was an early adopter of using information technologies to combat opioid diversion. Cherokee Nation healthcare providers implemented and relied on a prescription monitoring program ("PMP") before use of PMP was required. Cherokee Nation doctors access and review their patients' prescription histories directly at the point of care. Cherokee Nation also cracked down on opioid distributors promoting Cherokee Nation doctors to prescribe opioids, and modified its prescription drug "formulary" to eliminate certain prescription

---

[13] *See* Centers for Disease Control and Prevention, *NCHS - Drug Poisoning Mortality by County: United States*, DATA.CDC.GOV (Apr. 29, 2019), https://data.cdc.gov/NCHS/NCHS-Drug-Poisoning-Mortality-by-County-United-Sta/rpvx-m2md (visited Feb. 23, 2023).

opioids such as hydrocodone that are most widely distributed and/or sold by Defendant. But these measures are not effective in the face of Defendant's conduct.

37.     The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. From 2007 to 2012, heroin deaths in Oklahoma increased approximately ten-fold. Nationally, opioid overdose deaths and heroin use have increased in lockstep with opioid sales volumes.

38.     The CDC recently reported that the strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Studies indicate 75% of those who began their opioid abuse in the 2000s started with a prescription opioid. People who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.

39.     The overdose rate among American Indians, including Cherokee Nation citizens, is significantly higher than the rest of the population. American Indians in general are more likely than other racial/ethnic groups in the United States to die from drug-induced deaths. Among American Indian tribes, Cherokee Nation has been particularly hard hit by the effects of Defendant's opioid diversion. Oklahoma, where most Cherokee Nation citizens reside, has led the country in opioid abuse.

40.     It has been reported that by 12th grade, nearly 13 percent of American Indian teens have used OxyContin, one of the deadliest opioids when misused. The use of OxyContin by American Indian 12th-graders was about double the national average. A 2014 study funded by the National Institute on Drug Abuse found a much higher prevalence of drug and alcohol use in the American Indian 8th and 10th graders compared with national averages. American Indian students'

11

annual heroin and OxyContin use was about two to three times higher than the national averages in those years. The fact that American Indian teens, including Cherokee Nation children, are able to obtain OxyContin at these alarming rates indicates the degree to which drug diversion has created a secondary market for opioids.

41.     Sadly, even Cherokee Nation's youngest citizens bear the consequences of the opioid abuse epidemic. Many Cherokee infants are born suffering the effects of opioid withdrawal due to Neonatal Abstinence Syndrome. The impact of Neonatal Abstinence Syndrome can be life-long. Most Neonatal Abstinence Syndrome babies are immediately transferred to a neonatal intensive care unit for a period of days, weeks or even months, depending on the severity of the symptoms and complications related to the prenatal exposure to opioids. This can require an emergency helicopter evacuation from Cherokee Nation hospital to Tulsa for extraordinary emergency care to save the life of the newborn child. In many cases, disabilities follow these children through elementary school and beyond.

42.     It has been reported that pregnant American Indian women are up to 8.7 times more likely to be diagnosed with opioid dependency or abuse compared to the next highest race/ethnicity. On information and belief, these statistics apply similarly to pregnant women who are Cherokee citizens or the mothers of Cherokee children.

43.     As a result of Defendant's conduct, Cherokee Nation's Indian Child Welfare ("ICW") office, whose sole responsibility is to receive reports of child abuse and/or neglect, has seen a steady increase in the number of adults who abuse prescription opioid drugs. In recent years, as much as 40% of the ICW cases involving deprived children involved opioid abuse.

44.     Many of the babies or children who come into the custody of ICW to be placed in foster or adoptive homes were born with opioid dependence. This makes it difficult to find foster

parents because of the associated health problems and the considerable difficulties in caring for these babies. As a result, a significant number of Cherokee children are being placed in homes of non-Cherokee families. More than two-thirds of the Cherokee children who require foster or adoptive care must be placed with non-Cherokee families. Approximately 1,000 Cherokee children are placed in foster or adoptive homes every year. The Cherokee Nation, as protector of its history and culture, is irreparably injured when Cherokee children are sent to foster homes or adopted by non-Cherokee families.

45.     In recent years, the number of visits to Cherokee Nation's Behavioral Health Department have increased substantially. Cherokee Nation's Behavioral Health Department in Tahlequah alone has handled approximately 900 to 1,000 visits per month, or approximately 10,800 to 12,000 visits per year, from people seeking its services. At least half of those visits (around 5,700) are from people who have an addiction or substance-abuse problem. Of those 5,700 people, approximately half involve opioid abuse. Cherokee Nation also provides Behavioral Health and Substance Abuse Treatment in nine other clinics within the 14 Counties.

46.     The opioid crisis is especially harmful to Cherokee Nation's healthcare system because tribal communities, including Cherokee Nation, are already at a healthcare disadvantage compared to non-tribal communities. For example, according to a recent report from the U.S. Commission on Civil Rights, the average life span, infant mortality rates, and instances of substance abuse are all significantly worse in Indian Country compared to national averages.

47.     Defendant's misconduct has caused significant harms and trauma to Cherokee Nation society, and to its youth. The effects of trauma are compounded through the interconnectedness of Cherokee Nation, where individuals living in the community are highly connected through extended familial networks. Adverse childhood experiences among Cherokee

Nation children related to opioid use and addiction result in household dysfunction, which in turn results in greater likelihood of addictive disorders. These kinds of harms affect all or substantially all Cherokee Nation citizens, and in ways that are both unique to tribal communities and more severe compared to non-tribal communities.

48.     As a result of the opioid crisis, more and more Cherokee Nation resources are devoted to addiction-related problems, leaving a diminished pool of available resources to devote to positive societal causes like education, cultural preservation, and social programs. Meanwhile, the prescription opioid crisis diminishes the Cherokee Nation's available workforce, decreases productivity, increases poverty, and consequently requires greater government assistance expenditures by the Cherokee Nation.

49.     Defendant's conduct has ensured that Cherokee Nation will continue to experience the adverse consequences, and its citizens will continue to suffer from addiction rates and related injuries higher than national averages and, commensurately, that Defendant will continue to profit by supplying opioids to the area.

**B.      Defendant had a duty to identify, report, and halt suspicious orders, and to prevent diversion at the point of sale.**

50.     Defendant facilitated the supply of far more opioids than could have been justified to serve the market in Cherokee Nation.

51.     Defendant had a duty under both statutory and common law to maintain effective controls against diversion, and to investigate, report, and halt orders for prescription opioids that they knew or should have known were suspicious.

**1.      The common law.**

52.     Under the common law, Defendant, like all people, has a duty to act reasonably under the circumstances and owed such duty to Cherokee Nation.

53.     Defendant had a duty to exercise reasonable care in delivering dangerous narcotic substances. By flooding Cherokee Nation with more opioids than could be used for legitimate medical purposes, Defendant breached that duty. In doing so, Defendant not only failed to prevent foreseeable harm, but *created* foreseeable and preventable harm to Cherokee Nation and its citizens.

54.     Any reasonably-prudent company handling tens of millions of pills of highly dangerous controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) using automated/electronic systems to more closely scrutinize purchasing and dispensing trends and patterns, to include taking into consideration the size of local populations in which the pills were being consumed; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Oklahoma; (e) informing pharmacists about opioid diversion; (f) using their specialized knowledge about the supply and demand for controlled substances to prevent oversupply, rather than to facilitate it; and (g) in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies.

### 2.   Defendant's own conduct.

55.     One who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm. Defendant assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

56.     Defendant has recognized the magnitude of the problem and has made statements assuring the public they recognize their duty to curb the opioid epidemic.

3.      **Federal anti-drug diversion statutes and regulations.**

57.     The Federal Controlled Substances Act ("FCSA") sets the standard of conduct that Defendant must follow. It was designed to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." 208 H.R. Rep. No. 91-1444, *reprinted in* 1979 U.S.C.C.A.N. at 4572. The FCSA, along with its implementing regulations, impose duties on opioid distributors to maintain effective controls against the diversion of prescription opioids, and to report and take steps to halt suspicious orders of prescription opioids.

58.     Defendant was required to register with the DEA to manufacture and/or distribute controlled substances. *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100. As a registrant, Defendant was required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. The regulation states that, "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. 21 C.F.R. § 1301.74(b). Defendant was further required to take steps to halt suspicious orders. Defendant violated their obligations under federal law.

59.     As an opioid distributor, Defendant was required to "inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." 21 C.F.R. § 1301.74(b). In other words, they cannot be passive observers. The FCSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. §1301.74(b). *See* 21 U.S.C. § 842(a)(5), (c)(1)(B).

60.     Defendant must also "notify the Field Division Office of the Administration in his or her area, in writing, of any theft or significant loss of any controlled substances within one business day of discovery of the theft or loss." 21 C.F.R. § 1301.74(c). "Thefts and significant

losses must be reported whether or not the controlled substances are subsequently recovered or the responsible parties are identified and action taken against them." *Id.*

61.     Defendant was required to maintain "complete and accurate record[s]" of "all stocks" on hand and of "each such substance manufactured, received, sold, delivered, or otherwise disposed of by him." 21 U.S.C. § 827.

62.     Opioid distributors must also report "acquisition/distribution transactions" of Schedule II drugs and Schedule III narcotic drugs, including prescription opioids, through ARCOS. 21 C.F.R. § 1304.33.

63.     It is unlawful to "refuse or negligently fail to make, keep, or furnish any record, report, notification, declaration, order or order form, statement, invoice, or information required" by the FCSA. 21 U.S.C. § 842(a)(5).

64.     It is also unlawful to knowingly or intentionally "furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed" under the CSA. 21 U.S.C. § 843(a)(4).

65.     Lastly, Defendant must review information made available by the DEA through ARCOS. 21 U.S.C. 827(f)(3)(A). ARCOS accumulates data on distributors' controlled substances transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. 21 C.F.R. § 1304.33. ARCOS data includes (a) "[t]he total number of distributor registrants that distribute controlled substances to a pharmacy or practitioner registrant, aggregated by the name and address of each pharmacy and practitioner registrant," and (b) "[t]he total quantity and type of opioids distributed, listed by Administration Controlled Substances Code Number, to each pharmacy and practitioner registrant." 21 U.S.C. § 827(f). The data includes Defendant's transactions.

17

66.     The FCSA and its implementing regulations created a closed system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed system of distribution to prevent the diversion of legally produced controlled substances into the illicit market. Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants—which includes all manufacturers, distributors, and dispensers of controlled substances—must adhere to specific recordkeeping, monitoring, and reporting requirements and other duties that are designed to identify or prevent diversion. When registrants at any level fail to fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of opioids that has occurred in Cherokee Nation.

67.     The FCSA requires distributor registrants of controlled substances to: (a) apply for and receive a registration from DEA that authorizes a business to distribute a controlled substance; (b) maintain effective controls against the diversion of controlled substances; and (c) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them to the DEA.

68.     One method to ensure that controlled substances are not diverted is the requirement that all distributors "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id.* Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id.* One indicator of suspicion may include "[o]rdering the same controlled substance from multiple distributors."

69.    These suspicious order criteria are disjunctive and are not all inclusive. For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious. Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The unusual size of an order, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious. The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry.

70.    These federal statutes and regulations establish a standard of conduct and care for reasonably prudent distributor. Together, these laws make clear that opioid distributors possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for prescription controlled substances and of the risks and dangers of the diversion of prescription controlled substances if a distributor fails to adhere to the applicable standards of conduct and care.

71.    Further, these laws make clear that Defendant has a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply and diversion of prescription opioids.

72.    Defendant has a duty to determine whether the controlled substances it distributes are destined for potential illegitimate use or other diversion.

73.    Defendant breached these duties by failing to: (a) establish systems reasonably designed to identify suspicious orders; (b) conduct adequate due diligence to dispel suspicion

surrounding suspicious orders; (c) report suspicious orders; and (d) halt suspicious orders of controlled substances.

74.     Defendant was aware of these duties. In addition to being required to comply with the statutes and regulations set forth herein, opioid distributors also received detailed, specific guidance from DEA reiterating the requirements for suspicious order monitoring and maintaining effective controls against diversion.

75.     To combat prescription opioid diversion, the DEA has provided readily-available guidance to distributors on the requirements of suspicious order monitoring/reporting.

76.     Since 2006, the DEA has briefed distributors regarding legal, regulatory, and due diligence responsibilities. During these briefings, the DEA pointed out the red flags distributors should look for to identify potential diversion.

77.     Since 2007, the DEA has hosted at least five conferences to provide registrants (including distributors) with updated information about diversion trends and regulatory changes that affect the drug supply chain and suspicious order reporting.[14] On information and belief, all of the major distributors, including Defendant or its agents, attended at least one of these conferences.

78.     These conferences discussed, among other things, guidance on suspicious order monitoring and the distributors' obligations to conduct due diligence on controlled substance customers to help identify and prevent diversion. For example, the conferences explained that each

---

[14] Drug Enf't Admin., *Distributor Conferences*, https://www.deadiversion.usdoj.gov/mtgs/distributor/index.html; Drug Enf't Admin., *Manufacturer Conferences*, https://www.deadiversion.usdoj.gov/mtgs/man_imp_exp/index.html; Drug Enf't Admin., *National Conference on Pharmaceutical and Chemical Diversion*, https://www.deadiversion.usdoj.gov/mtgs/drug_chemical/index.html; Drug Enf't Admin., *Diversion Awareness Conferences*, https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/index.html.

distributor must exercise due care in confirming the legitimacy of all orders. They also described circumstances that could indicate diversion, including ordering (a) excessive quantities of a limited variety of controlled substances while ordering few if any other drugs, or (b) the same controlled substance from multiple sources. They also covered distributors' obligations to report suspicious orders when discovered and specified that monthly transaction reports of "excessive purchases" did not meet the regulatory criteria for suspicious order reporting. The conferences also advised distributors that they must independently analyze a suspicious order before sale to determine if the controlled substances would likely be diverted and that filling a suspicious order and then completing the sale does not absolve a distributor from legal responsibility.

79.      On September 27, 2006, and December 27, 2007, the DEA's Office of Diversion Control sent letters to all registered distributors providing guidance similar to that provided at the conferences.[15]

80.      In April 2008, the DEA met with Defendant's President Paul Dickson, Sr., and discussed Defendant's legal obligations and requirements as a distributor, including suspicious order requirements, the need to know its customers, and the need to conduct due diligence.[16] It reviewed ARCOS data with Defendant to show customers who had anomalies and to demonstrate "things that [Defendant] should be looking at and questioning [its] customers about."[17] Additionally, in 2013 and 2015, the DEA conducted distributor conferences that were attended by

---

[15] Masters Pharmaceuticals, Inc.; Decision and Order, 80 Fed. Reg. 55,418, 55,421 (Drug Enf't Admin. Sept. 15, 2015) (No. 13–39), 2015 WL 5320504.
[16] *In re Morris & Dickson Co., LLC*, Docket No. 18-31, 88 Fed. Reg. 34523, 34525 (May 30, 2023) [hereinafter "Decision and Order"].
[17] *Id.*

Defendant's compliance officer, Jacob Dickson, who had presented Defendant's suspicious order monitoring system during at least one meeting with DEA officials.[18]

81.     Opioid distributors were on notice that their own industry group, HDMA published Industry Compliance Guidelines for reporting suspicious orders and preventing diversion.[19]

82.     These industry guidelines further explained that, by being "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."[20]

83.     Cherokee Nation is not asserting a cause of action under these statutory laws. But just as a driver's violation of a speed limit can demonstrate that he acted negligently, so, too, Defendant's violations of applicable state and federal laws and regulations show that they failed to meet the relevant standard of care.

4.     **Duties under Oklahoma controlled substances law.**

84.     Defendant also had duties under applicable Oklahoma law regarding controlled substances distribution. In addition to having common law duties under Oklahoma law, the Oklahoma Uniform Controlled Dangerous Substances Act ("Oklahoma CSA"), 63 OKLA. STAT. Ch. 2, and its implementing regulations impose duties on opioid distributors to maintain effective controls against the diversion of prescription opioids, and to report and take steps to halt suspicious orders of prescription opioids. Defendant's violation of these requirements shows that they failed to meet the relevant standard of conduct expected from them.

---

[18] *Id.*

[19] Healthcare Distrib. Mgmt. Ass'n (HDMA), *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App. B at 1).

[20] *Id.*

85.     The Oklahoma CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the ultimate user. Every person or entity who distributes or dispenses opioids must obtain a "registration" from the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the prescription opioid supply chain must fulfill their obligations under the Oklahoma CSA, otherwise there is great potential for harm to Cherokee Nation.

86.     Under the Oklahoma CSA and the Oklahoma administrative code, distributors must maintain effective controls against prescription opioid diversion. They must create and use a system to identify and report to law enforcement any suspicious orders of controlled substances. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, identify and report suspicious orders, conduct due diligence, and terminate orders where the suspicion cannot be resolved.

87.     To prevent unauthorized users from obtaining opioids, Oklahoma law creates a distribution monitoring system for controlled substances. The Oklahoma CSA requires distributors and dispensers of controlled dangerous substances to keep records and maintain inventories in conformance with applicable laws and regulations.

88.     The Oklahoma administrative code requires anyone who distributes or dispenses prescription opioids to inform the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of suspicious orders. Such orders include those of unusual size or frequency and those deviating substantially from a normal pattern.

89.     Likewise, the Oklahoma administrative code requires that opioid distributors and dispensers notify the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of any

theft or significant loss of any controlled dangerous substances. Thefts must be reported whether or not the controlled dangerous substances are subsequently recovered and/or the responsible parties are identified, and action taken against them.

90.     Opioid distributors and dispensers are also required to maintain records, reports, and inventory in accordance with Oklahoma law, including by complying with their registration and opioid-tracking requirements. Distributors also have a duty to maintain effective controls against diversion of controlled substances.

91.     The reason for the reporting rules under controlled substances laws is to create a "closed" system intended to control the supply and reduce the diversion of these drugs from legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical. Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

92.     Defendant was well aware it had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

C.      **Defendant deliberately disregarded its duties.**

1.      **The distribution numbers alone establish gross negligence.**

93.     Despite knowing the risks of diversion and their broad assurances to regulators and the public, Defendant recklessly or negligently allowed diversion. Their misconduct resulted in a settlement with the DEA in 2019.[21] Additionally, their misconduct caused the DEA to suspend Defendant's Certificates of Registration ("registrations") to distribute controlled substances in May 2018,[22] which the DEA followed up by deciding to permanently revoke Defendant's registrations on May 30, 2023.[23]

94.     The distribution numbers themselves portray a chilling picture of Defendant's misconduct and gross negligence.

95.     Defendant is responsible for selling a large percentage of opioids that were diverted and abused in Cherokee Nation during the relevant time period.

96.     Between 2010 and 2014, Defendant shipped more than 3.7 million dosage units of prescription opioids into five pharmacies in the 14 Counties of the Cherokee Nation

97.     Roland Pharmacy was one of the five pharmacies in the 14 Counties to which Defendant distributed prescription opioids. Roland Pharmacy was located in Roland, Oklahoma,

---

[21] Specifically, on May 24, 2019, the U.S. Department of Justice and the DEA announced that Defendant had agreed to pay the United States $22 million in civil penalties to resolve claims that it violated the Controlled Substances Act by failing to report suspicious orders of hydrocodone and oxycodone.

[22] *DEA Suspends The Registration of Morris and Dickson Company From Distributing Controlled Substances*, Drug Enforcement Administration (May 4, 2018), https://www.dea.gov/press-releases/2018/05/04/dea-suspends-registration-morris-and-dickson-company-distributing.

[23] *See In re Morris & Dickson Co., LLC*, Docket No. 18-31, 88 Fed. Reg. 34523 (May 30, 2023) [hereinafter "Decision and Order"]. DEA delayed the revocation's effective date until August 28, 2023, due to "the potential need for [Defendant's] customers and their patients to find new suppliers" as well as "the possibility for renewed settlement negotiations ... ." *See In re Morris & Dickson Co., LLC*, No. 18-31, 88 Fed. Reg. 34522, 34522 (May 30, 2023).

a small town in Sequoyah County—one of the 14 Counties of the Cherokee Nation—with a population of 3,495. In 2017, Roland Pharmacy was Defendant's eleventh biggest customer nationwide for oxycodone.[24] In 2013, Defendant shipped 294,850 dosage units of Oxycodone 10 mg, Oxycodone 15 mg, Oxycodone 30 mg, and Hydrocodone 10 mg to Roland Pharmacy. This is equivalent to 84.36 pills per capita. In 2014, Defendant's distribution to Roland Pharmacy jumped to 479,520 dosage units, which is equivalent to 137.20 pills per capita. In 2013 and 2014, Defendant distributed a total of 774,370 dosage units to Roland Pharmacy.

98.     Johnny's Hometown Pharmacy was another of the five pharmacies in the 14 Counties to which Defendant distributed prescription opioids. Johnny's Hometown Pharmacy was also located in Roland, Oklahoma. Between 2010 and 2014, Defendant distributed a total of 1,551,400 dosage units of Oxycodone 10 mg, Oxycodone 15 mg, Oxycodone 30 mg, and Hydrocodone 10 mg to Johnny's Hometown Pharmacy. Given the population of Roland, this is equivalent to 88.78 pills per capita, per year.

99.     The Wellness Clinic of Roland was a purported medical clinic in Roland, Oklahoma.

100.    The Wellness Clinic of Roland exhibited many signs of a pill mill. It only accepted cash payments,[25] which is a hallmark of a pill mill. It did not accept insurance and refused to assist patients in the filing of their insurance claims. The waiting room for the clinic was always full, sometimes with standing room only.[26] It was not unusual for 30-50 vehicles to be parked in the

---

[24] *Morris & Dickson Co., LLC v. Sessions*, Order to Show Cause and Immediate Suspension of Registration, Case No. 5:18-cv-00605 (W.D. La. May 10, 2018) (ECF No. 19-1).
[25] *State of Oklahoma, ex rel. The Oklahoma State Board of Medical Licensure and Supervision v. George B. Howell, Sr., MD, License No. 27533*, Order of Revocation of License, Case No. 12-05-4543 (Aug. 28, 2015).
[26] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. George B. Howell, Sr., M.D.*, Complaint, Case No. 12-05-4543 (Aug. 1, 2014).

26

parking lot with people milling around and going from vehicle to vehicle.[27]  Patients would line up outside the front door before the 8:30 opening time.  Patients traveled to the Wellness Clinic of Roland from Arkansas, Mississippi, Alabama, Louisiana, and Texas.[28]  The clinic was seeing 120 patients per day and had a goal of adding 10 patients per week, with the incentive of prescriber bonuses based on a quota of patients seen.[29]

101.    The Wellness Clinic of Roland's status as a pill mill was confirmed by law enforcement.  Law enforcement found that many prescription medications found "on the street" were coming from prescribers at the Wellness Clinic of Roland.[30]  In addition, the Oklahoma Bureau of Narcotics and Dangerous Drugs ("OBNDD") conducted three undercover visits at the Wellness Clinic of Roland.[31]  During the first visit, Bernard Tougas—a licensed Oklahoma Physician Assistant ("PA") who owned and operated the Roland Wellness Clinic—saw the OBNDD agent/patient. PA Tougas provided a prescription for oxycodone #84. The prescription was signed by Dr. John Friedl, who was employed by the clinic.[32]  On the second visit, the agent/patient again saw PA Tougas and was provided a prescription signed by Dr. Friedl for oxycodone and Ultram (tramadol).  On the third visit, the agent/patient saw Dr. Friedl, complained

---

[27] *State of Oklahoma, ex rel. Oklahoma State Board of Osteopathic Examiners v. John Friedl, D.O., Osteopathic Medical License No. 2743*, Complaint, Case No. 0413-40 (Aug. 6, 2015).
[28] *State of Oklahoma, ex rel. Oklahoma State Board of Osteopathic Examiners v. John Friedl, D.O., Osteopathic Medical License No. 2743*, Complaint, Case No. 0413-40 (Aug. 6, 2015); *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. George B. Howell, Sr., M.D.*, Complaint, Case No. 12-05-4543 (Aug. 1, 2014).
[29] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers, MD, License No. 17754*, Amended Complaint, Case No. 12-05-4542 (Aug. 22, 2014).
[30] *State of Oklahoma, ex rel. The Oklahoma State Board of Medical Licensure and Supervision v. George B. Howell, Sr., MD, License No. 27533*, Order of Revocation of License, Case No. 12-05-4543 (Aug. 28, 2015).
[31] *State of Oklahoma, ex rel. Oklahoma State Board of Osteopathic Examiners v. John Friedl, D.O., Osteopathic Medical License No. 2743*, Complaint, Case No. 0413-40 (Aug. 6, 2015).
[32] In Oklahoma, PAs are prohibited from prescribing Schedule II substances.

of being sore after working out, and Dr. Friedl increased the dosage of the oxycodone he prescribed. Investigators with the Oklahoma State Board of Medical Licensure and Supervision ("Oklahoma Medical Board") also conducted undercover operations at the Wellness Clinic of Roland. The investigators conducted two undercover operations with a patient of the clinic on December 10, 2013, and on January 7, 2014. At *each* visit, PA Tougas provided the patient the following prescriptions signed by another doctor employed by the clinic, Dr. Ronald Myers: 30 mg oxycodone #224, 20 mg oxycodone #30, 60 mg oxycontin #84, and 10 mg Valium #112. The December visit was approximately 43 seconds long, and the January visit was approximately two minutes long.[33]

102.  Patients of the Wellness Clinic of Roland have confirmed that the Wellness Clinic of Roland was a pill mill. Some complainants to the Oklahoma Medical Board "repeatedly referred to the Wellness Clinic of Roland as a 'pill mill' for CDS [controlled dangerous substances] which, as one patient aptly described, was getting as many people in and out of the clinic with their prescriptions as quickly as possible without providing actual medical care."[34] Several patients described for the Oklahoma Medical Board the conditions under which they could easily receive high-dose opioid prescriptions without a legitimate medical purpose and outside the course of legitimate practice.[35]

---

[33] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. George B. Howell, Sr., M.D.*, Complaint, Case No. 12-05-4543 (Aug. 1, 2014); *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers, MD, License No. 17754*, Amended Complaint, Case No. 12-05-4542 (Aug. 22, 2014).
[34] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. George B. Howell, Sr., M.D.*, Complaint, Case No. 12-05-4543 (Aug. 1, 2014); *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers, MD, License No. 17754*, Amended Complaint, Case No. 12-05-4542 (Aug. 22, 2014).
[35] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. George B. Howell, Sr., M.D.*, Complaint, Case No. 12-05-4543 (Aug. 1, 2014).

103.     Pharmacies near Roland, Oklahoma considered the Wellness Clinic of Roland to be a pill mill. As the clinic's practice expanded, many pharmacies began turning away customers with prescriptions from the clinic due to the massive quantities of controlled substance prescriptions coming from prescribers and the suspicious nature of the prescriptions. Several pharmacies in the area stated that the oxycodone prescriptions from the Wellness Clinic of Roland shot up so high that the pharmaceutical suppliers were refusing to fill the pharmacies' drug orders.[36] In fact, an Oklahoma Medical Board investigator met with the regional director for Walgreens for the area around Roland, Oklahoma.[37]  According to the Oklahoma Medical Board records, the Walgreens regional director explained that Walgreens was concerned with the large number of individual patients bringing in prescriptions for oxycodone 30 mg, 15 mg, and Xanax (alprazolam) on a single visit.  He expressed that many of these people were young, gave an out-of-state address, and paid cash for the prescriptions.

104.     The prescribers employed by the Wellness Clinic of Roland have also confirmed that the clinic was a pill mill. Dr. Friedl testified during a hearing before the OBNDD that "some of his patients were 'drug seekers,' trying to increase their dosages and were overly sedated while at [the clinic]."[38]  He testified that he believed "about 50% of the patients at [the Wellness Clinic of Roland] were not legitimate patients, and were 'gaming the system,' and that he "was aware [the Wellness Clinic of Roland] was a 'pill mill' prior to accepting employment" there. Similarly, Dr. Myers acknowledged the findings of fact and conclusions of law as stated in an OBNDD order

---

[36] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers, MD, License No. 17754*, Amended Complaint, Case No. 12-05-4542 (Aug. 22, 2014).
[37] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. George B. Howell, Sr., M.D.*, Complaint, Case No. 12-05-4543 (Aug. 1, 2014).
[38] *State of Oklahoma, ex rel. Oklahoma State Board of Osteopathic Examiners v. John Friedl, D.O., Osteopathic Medical License No. 2743*, Complaint, Case No. 0413-40 (Aug. 6, 2015).

dated April 2, 2015.[39]  On April 2, 2015, the OBNDD found that Dr. Myers, as the medical director

and President of the Wellness Clinic of Roland, managed the clinic "like a pill mill that herded

patients through the Clinic and prescribed CDR in large quantities based upon little to no physical

examination or with no legitimate medical purpose."[40] The Wellness Clinic of Roland became so

well known as a pill mill that people were traveling to it from far away a Colorado [sic].  Patients

came from at least 10 different states, some travelling as far as 1800 miles (mile round) [sic]."[41]

105.    The Wellness Clinic of Roland, which was located at 205 East Ray Fine Blvd.,

Roland, was 0.7 miles east of Roland Pharmacy, which was located at 105 East Ray Fine Blvd.,

and 0.5 miles west of Johnny's Hometown Pharmacy, which was located at 303 East Ray Fine

Blvd.

106.    The location and close proximity of Roland Pharmacy and Johnny's Hometown

Pharmacy to the Wellness Clinic of Roland, combined with the purchasing patterns of these two

pharmacies, suggest that both filled prescriptions from the Wellness Clinic of Roland.   For

example, the large annual increases and corresponding exceedingly high quantities of hydrodocone

10 mg and oxycodone 10 mg, 15 mg, and 30 mg, as well as the disparate ordering patterns with

respect to oxycodone 10 mg and 30 mg, met the suspicious order criteria.

107.    The suspicious orders placed by these pharmacies to Defendant should have

triggered due diligence by Defendant. By failing to conduct adequate due diligence sufficient to

---

[39] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers, M.D., License No. 17754*, Voluntary Surrender in Lieu of Prosecution, Case No. 12-05-4542 (May 14, 2015).
[40] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers MD, License No. 17754*, Voluntary Surrender In Lieu of Prosecution, Case No. 12-05-4542 (May 14, 2015).
[41] *State of Oklahoma, ex rel. The Oklahoma Board of Medical Licensure and Supervision v. Ronald Myers, MD, License No. 17754*, Amended Complaint, Case No. 12-05-4542 (Aug. 22, 2014).

dispel suspicion, and instead continuing to ship large quantities of prescription opioids to these pharmacies, Defendant was negligent and enabled a pill mill to harm members of Cherokee Nation.

        **2.**        **Defendant continued to violate its duties.**

      108.    Defendant breached its duties because they failed to maintain effective controls against the diversion of prescription opioids, and to report and take steps to halt suspicious orders of prescription opioids.

      109.    Defendant failed to design and operate a system to identify and adequately report suspicious orders of prescription opioids. This was DEA's basis for permanently revoking Defendant's registrations to distribute controlled substances. According to the Decision and Order, Defendant "continued to distribute controlled substances despite the red flags raised in its due diligence files and without either adequately documenting an investigation or resolution of the red flags or refusing to ship and reporting the orders to DEA. As such, [Defendant's] due diligence was clearly insufficient to meet DEA's legal requirements."[42]

      110.    From at least January 2014 to May 2018, Defendant kept no formal records in the regular course of business on the investigation of orders which Defendant did not ultimately find suspicious.[43] During this period, Defendant filed only three suspicious order reports with DEA,[44] even though Defendant shipped thousands of orders that DEA later found were suspicious and that thus should have been reported and should not have been shipped; for all of Defendant's customers, DEA's "ballpark" estimate of suspicious orders that might have been identified by adequate monitoring included 7,252 sales of oxycodone and 4,948 sales of hydrocodone during this period.[45]

---

[42] Decision and Order, 88 Fed. Reg. at 34536-37.
[43] *Id.* at 34524-25 (quoting Defendant's supplemental response to subpoena, which was signed by then-President Paul Dickson)
[44] *Id.* at 34523.
[45] *Id.* at 34534.

111.   Defendant failed to adequately and effectively train their employees on the following non-exhaustive topics: (a) what constitutes a suspicious order of prescription opioids; and (b) what measures and/or actions should be taken when an order of prescription opioids is identified as suspicious.

112.   Upon information and belief, Defendant failed to analyze: (a) the volume of prescription opioids ordered by pharmacies relative to the population of the pharmacies' communities; (b) the increase in prescription opioid sales relative to past years; (c) the number of prescription opioids that were ordered relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

113.   Upon information and belief, Defendant also failed to adequately use data available to them—including ARCOS data, marketing and sales data, demographic data, etc.—to identify pharmacies that were ordering suspicious volumes of prescription opioids, or to perform statistical analysis to avoid distributing prescription opioids that were diverted or otherwise contributed to the opioid crisis.

114.   Upon information and belief, Defendant also failed to submit suspicious order reports even when their limited due diligence identified red flags about particular pharmacies and orders that Defendant was required to resolve before distribution.

115.   Defendant was, or should have been, fully aware that the quantity of prescription opioids they were distributing was untenable, and in many respects, patently absurd, yet they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances, and instead they distributed these prescription opioids.

116.    Defendant knew or should have known that the amount of opioids that it supplied to pharmacies in Cherokee Nation far exceeded what could be consumed for medically necessary purposes.

117.    Defendant negligently or recklessly failed to control their supply lines to prevent diversion. A reasonably prudent distributor of controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example: (1) taking greater care and due diligence in hiring, training, and supervising employees; (2) providing greater oversight, security, and control of supply channels; (3) looking more closely at pharmacies and facilities that were purchasing large quantities of commonly-abused opioids in amounts much greater than appropriate, given the size of the local populations; (4) eliminating corporate policies that facilitated and/or encouraged unlawful distribution and sales of prescription opioids; (5) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers on and around Cherokee Nation; (6) informing pharmacies and retailers about prescription opioid diversion; (7) using their specialized knowledge and capabilities about local and national supply and demand for prescription drugs, as among the largest and most sophisticated companies in the United States handling these products, including highly addictive and dangerous opioid products; (8) using specialized data, statistics and analytical resources readily available to them (but not to the public) to identify suspicious transactions, orders, or dispensing activity; (9) not making statements to regulators and to the public that provided false assurances Defendant was adhering to their duties and responsibilities; and (10) following statutes, regulations, professional standards, and guidance from government agencies. Defendant was under a duty to speak with respect to their distribution of suspicious orders, and yet they concealed their wrongdoing from the DEA, the public, and Cherokee Nation.

33

118.    Defendant violated 21 U.S.C. § 843(a)(4) by knowingly and intentionally furnishing false material information in, and omitting material information from, reports, records, and other documents required to be made, kept, and filed under applicable laws, as the information relates to Defendant's unlawful distribution practices, including Defendant's failure to maintain effective controls against diversion, failure to report suspicious prescription opioids orders, and failure to halt suspicious orders of prescription opioids. Defendant concealed the reality of the suspicious orders that they filled on a daily basis—leading to the diversion of millions of doses of prescription opioids into the illicit market.

119.    Defendant also violated Oklahoma statutes that make it unlawful "[t]o furnish false or fraudulent material information in, or omit any material information from, any application, report, or other document required to be kept or filed under this act, or any record required to be kept by this act . . . ." 63 OKLA. STAT. § 2-406(A)(4).

120.    In addition, Defendant violated Section 2-401(A)(1), which makes it unlawful to distribute or dispense a controlled substance except as authorized by state law, which would include the Oklahoma Uniform Controlled Dangerous Substances Act and implementing regulations. 63 OKLA. STAT. § 2-401(A)(1). By turning a blind eye to diversion, Defendant aided and abetted the unlawful distribution and dispensing of prescription opioids, in violation of 63 OKLA. STAT. § 2-401(A)(1).

**D.**    **Defendant has injured and continues to injure Cherokee Nation.**

121.    Defendant had the ability and the duty to prevent prescription opioid diversion described in this Petition, which presented known or foreseeable dangers of serious injury. But they failed to do so, resulting in substantial injury to Cherokee Nation and its citizens.

122.    It was reasonably foreseeable to Defendant that their violations of their duties under federal and Oklahoma laws and regulations would allow prescription opioids to be diverted.

123.    It was reasonably foreseeable to Defendant that their failure to prevent diversion would cause injuries, including addiction, overdoses, and death. It was also reasonably foreseeable that many of these injuries would be suffered by Cherokee Nation and its citizens, and that the costs of these injuries would be shouldered by Cherokee Nation.

124.    Defendant knew or should have known that the opioids being diverted from their supply chains would contribute to Cherokee Nation's opioid epidemic, and would create access to opioids by unauthorized users, which, in turn, would perpetuate the cycle of addiction, demand, and illegal transactions.

125.    Defendant knew of widespread prescription opioid abuse both nationally, and in Cherokee Nation, but nevertheless persisted in a pattern of distributing and selling commonly-abused opioids in places—and in such quantities, and with such frequency—that they knew or should have known these opioids were not being prescribed and consumed for legitimate medical purposes. They could not maintain policies that facilitated this while complying with their duties under state and federal law.

126.    The use of opioids by Cherokee Nation's citizens who were addicted or who did not have a medically necessary purpose for using opioids could not have occurred without the actions of Defendant. If Defendant had guarded against diversion, Cherokee Nation and its citizens would have avoided significant injury.

127.    Defendant profited substantially from their unlawful oversupply of prescription opioids in Cherokee Nation. Their participation and cooperation have foreseeably caused direct

injuries and damages to Cherokee Nation. Defendant knew or should have known that Cherokee Nation would be unjustly forced to bear the costs of the resulting injuries.

128.    Defendant's conduct showed a reckless disregard for the safety of Cherokee Nation and its citizens.

129.    Defendant's conduct poses a continuing threat to the health, safety, and welfare of Cherokee Nation and its citizens.

130.    At all relevant times, Defendant engaged in these activities, and continues to do so, knowing that Cherokee Nation in its role of providing protection and care for its citizens, would have to provide or pay for additional costs to the healthcare, criminal justice, social services, welfare, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

**E.      Defendant's concealment and conspiracy.**

131.    Defendant should be prevented or estopped from asserting the statute of limitations as any defense or limitation to liability for their misconduct. Defendant undertook efforts to conceal their unlawful conduct and falsely assure the public, including Cherokee Nation, that they were undertaking efforts to comply with their obligations to prevent opioid diversion, all with the goal of continuing to generate profits.

132.    Defendant has also concealed and prevented discovery of information, including ARCOS-related data, which will confirm the extent of their unlawful activities and its direct impact on Cherokee Nation.

133.    Because of this concealment of material information, Cherokee Nation did not know of the existence or scope of Defendant's misconduct at issue in this lawsuit, and could not have acquired such knowledge sooner through the exercise of reasonable diligence. Only

Defendant knew of their repeated, intentional failures to prevent opioid diversion in Cherokee Nation. Defendant cannot claim prejudice due to a late filing, because this suit was filed upon discovering the facts essential to the claim. Defendant knew their conduct was deceptive, and they intended it to be deceptive. Thus, Cherokee Nation was unable to obtain vital information regarding these claims absent any fault or lack of diligence on its part.

134.    Defendant agreed with other distributors to accomplish the unlawful purposes of selling and distributing prescription opioids through violations of law and misrepresentations. They performed numerous overt acts in furtherance of this conspiracy, including selling and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to the diversion of prescription opioids.

135.    Defendant agreed with other distributors to disregard their duties under state and federal law to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market. Disregarding their duties allowed them to unlawfully increase sales, revenues, and profits.

136.    Defendant distributes or dispenses far greater quantities of prescription opioids than they know could be reasonably necessary for legitimate medical uses, while failing to identify, report and take steps to halt suspicious orders, creating an oversupply of prescription opioids that fueled an illicit secondary market. As a result of Defendant's wrongful acts, Defendant created the opioid epidemic, and Cherokee Nation and its citizens have suffered injuries and damages.

137.    When a distributor does not identify, report or stop suspicious orders, prescriptions for controlled substances may be written and dispensed to individuals who abuse them or who sell them to others to abuse. This, in turn, fuels and expands the illegal market and results in opioid-related addiction and overdoses. Without identification and reporting by those involved in the

supply chain, law enforcement may be delayed in taking action - or may not know to take action at all.

## V.   CLAIMS FOR RELIEF

### COUNT I: NEGLIGENCE/GROSS NEGLIGENCE

138.   The Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

139.   Defendant owes a duty to act reasonably under the circumstances.

140.   Defendant owes a duty to prevent the diversion of prescription opioids.

141.   Defendant also has duties under federal and Oklahoma law, including the FCSA and the Oklahoma CSA, to exercise reasonable care in selling and distributing opioids. These duties include maintaining effective controls against the diversion of prescription opioids, and identifying, reporting and halting the shipment of suspicious orders of prescription opioids.

142.   The conduct of Defendant fell below the reasonable standard of care. Their negligent acts include the following:

a.   oversupplying the market in and around Cherokee Nation with highly-addictive prescription opioids;

b.   using unsafe distribution practices;

c.   enhancing the risk of harm from prescription opioids by failing to act as a defense against diversion;

d.   inviting criminal activity into Cherokee Nation by disregarding precautionary measures built into applicable laws and regulations;

e.   failing to adhere to all applicable laws and regulations pertaining to the distribution and sale of prescription opioids;

f.   failing to train or investigate their employees properly;

g.   failing to report suspicious orders or refuse to fill them;

h.      failing to provide effective controls and procedures to guard against theft and diversion of controlled substances; and

i.      failing to police the integrity of the supply chain for prescription opioids.

143.   Defendant had a responsibility to control the sale and distribution of prescription opioids.

144.   Defendant sold prescription opioids when it knew or should have known that: (a) there was a substantial likelihood that many of the sales were for non-medical purposes; and (b) opioids are inherently dangerous when used for non-medical purposes.

145.   Defendant was negligent or reckless in not acquiring or not utilizing special knowledge and special skills that relate to the dangerous activity of selling opioids in order to prevent or ameliorate such distinctive and significant dangers.

146.   Defendant was also negligent or reckless in failing to guard against foreseeable third-party negligence or misconduct, including that of negligent or corrupt prescribers, pharmacists, and staff, and criminals who buy and sell opioids for non-medical purposes.

147.   Defendant breached its duty to exercise the degree of care commensurate with the dangers involved in selling dangerous controlled substances.

148.   Defendant was also negligent or reckless in voluntarily undertaking duties to Cherokee Nation that they breached. Defendant, through their statements to the media, regulators, insurance companies, customers, and the public at large, undertook duties to take all reasonable precautions to prevent drug diversion.

149.   Defendant's conduct was the cause-in-fact and proximate cause of injuries and damages to Cherokee Nation, including but not limited to the following: increased costs for the healthcare, criminal justice, social services, welfare, and education systems, as well as the cost of lost productivity and lower tax revenues.

150. Cherokee Nation is without fault, and the injuries to it would not have happened in the ordinary course of events if Defendant had used due care commensurate to the dangers involved in the distribution of prescription opioids.

151. The reckless, wanton, and reprehensible nature of Defendant's conduct entitles Cherokee Nation to an award of punitive damages and attorneys' fees and costs. Defendant intentionally failed to perform their manifest duty to protect against prescription opioid diversion in reckless disregard of the consequences to Cherokee Nation and in callous indifference to the life, liberty, and property of Cherokee Nation or Cherokee Nation's people.

## COUNT II: UNJUST ENRICHMENT

152. Cherokee Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

153. Should Cherokee Nation lack a remedy at law, the Court should exercise its equitable jurisdiction to grant relief for unjust enrichment.

154. Cherokee Nation has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendant's conduct.

155. Cherokee Nation's expenditures in providing healthcare services to people who use opioids have added to Defendant's wealth. The expenditures by Cherokee Nation have helped sustain Defendant's businesses.

156. In this way, Cherokee Nation has conferred a benefit upon Defendant, by paying for what may be called Defendant's externalities—the costs of the harm caused by Defendant's improper sales, distribution, and dispensing practices.

157. Defendant made substantial profits from their sale of prescription opioids while fueling the prescription opioid epidemic in Cherokee Nation.

158.     Defendant continues to receive considerable profits from the sale and distribution of controlled substances in Cherokee Nation. Defendant is aware of these obvious benefits, and that retention of these benefits is not justified under these circumstances. Defendant has been unjustly enriched by these benefits. It would be inequitable to allow Defendant to retain these benefits.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Cherokee Nation, prays that this Court enter judgment in its favor against Defendant and:

a.     On Count I (Negligence/Gross Negligence):

    i.     Award Cherokee Nation compensatory damages for the increased costs to Cherokee Nation's healthcare, criminal justice, social services, welfare, and education systems, as well as the cost of lost productivity due to Defendants' negligence;

    ii.     Award Cherokee Nation punitive damages;

    iii.     Award Cherokee Nation attorneys' fees and costs; and

    iv.     Order such further relief as justice and equity may require.

b.     On Count II (Unjust Enrichment):

    i.     Award Cherokee Nation restitution of its costs caused by Defendants' actions, including the costs of addressing Defendants' externalities and the costs of prescription opioids paid for by Cherokee Nation;

    ii.     Disgorge Defendants of all amounts they have unjustly obtained; and

    iii.     Order such further relief as justice and equity may require.

## REQUEST FOR JURY TRIAL

Cherokee Nation respectfully requests that all issues presented by its above Petition be tried by a jury, with the exception of those issues that, by law, must be tried before the Court.

DATED:   June 8 , 2023

Respectfully Submitted,

Sara Hill, Oklahoma Bar. No. 20072
Attorney General
THE CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74464

Richard W. Fields
FIELDS HAN CUNNIFF PLLC
1701 Pennsylvania Ave., N.W., Suite 200
Washington, D.C. 20006
(800) 878-1432
fields@fhcfirm.com
*ADMISSION PRO HAC VICE REQUESTED*

Frank Sullivan, III Oklahoma Bar. No. 19582
SULLIVAN & SULLIVAN, PLLC
P.O. Box 768, 105 N. Oak
Sallisaw, OK  74955
(918) 775-9149
fsullivan@franksullivanlaw.com